UNITED STATES of America

v.

William E. BLAND, Katherine Bland, De-
fendants and Third-Party Plaintiffs
(Merrill SACHS, trading as Tri-Tilt
Storm Window Company

and

Baltimore Federal Savings & Loan Asso-
ciation, Third-Party Defendants).

Civ. No. 9389.

United States District Court
D. Maryland,
Civil Division.

Feb. 20, 1958.

**396**

---

Leon H. A. Pierson, U. S. Atty., and John Gordon Underwood, Asst. U. S. Atty., Baltimore, Md., for United States.

Herbert S. Garten and James D. Nolan, Baltimore, Md., for Blands.

William Greenfeld, Baltimore, Md., for Merrill Sachs, t/a Tri-Tilt Storm Window Co.

Symone S. Spector and Julius A. Victor, Jr., Baltimore, Md., for Baltimore Federal Savings & Loan Ass'n.

Norwood B. Orrick and David C. Green, Baltimore, Md., for Maryland Bankers Ass'n, amicus curiae.

THOMSEN, Chief Judge.

Defendants (the Blands) have moved for judgment in their favor at the close of plaintiff's case in this action brought by the United States as assignee of the Blands' promissory note. This note had been endorsed without recourse by Tri-Tilt Storm Window Company, the original payee, to Baltimore Federal Savings & Loan Association, and thereafter assigned by the Loan Association to the United States. It had been given in connection with an instalment sale of storm windows and doors by Tri-Tilt to the Blands, and had been insured under Title I of the National Housing Act, 12 U.S.C.A. § 1701 et seq.

The motion raises the issue whether the sale comes within the purview of the Maryland Retail Instalment Sales Act, Ann.Code of Md., 1957 ed., Art. 83, secs. 128 to 153. It is admitted that Tri-Tilt did not comply with the requirements of the Maryland Act, so, if the transaction comes within that act the agreement of sale and the instruments signed by the Blands were void, the Blands had a right to cancel the agreement and receive a refund of any payment made, and the note is subject to all defenses which the Blands might have asserted against Tri-Tilt or the Loan Association. Sec. 128 (b), sec. 128(c) (1) and sec. 147.

Other questions are raised by the answer of the Blands, and by the third party complaint which they filed against Tri-Tilt and the Loan Association, but those questions are not before the court on this motion.

Witnesses called by the United States Attorney testified with respect to the course of dealings between the several parties; counsel for the respective parties cross-examined these witnesses and offered in evidence numerous exhibits. The case has been fully and ably briefed, and the court has had the benefit of a memorandum filed on behalf of the Maryland Bankers Association as amicus curiae.

### The Maryland Retail Installment Sales Act

The Maryland Retail Installment Sales Act was enacted in 1941. It reflects the view that improvident and careless consumers who buy on the instalment plan need legal protection, since buyers ordinarily do not read their contracts and associated papers carefully. Stride v. Martin, 184 Md. 446, 451, 41 A.2d 489. "Because of the misleading or ambiguous manner of stating the finance rate and other charges in the usual installment contract, few installment buyers are aware of the rate or charges which they are actually paying." Research Bulletin No. 6, Maryland Legislative Council, September, 1940, p. 34. The act "was passed to protect instalment plan buyers. Its purpose was 'not only to prevent actual frauds but to close avenues to fraud.' " Griffin v. Baltimore Federal Savings & Loan Ass'n, 204 Md. 154, 159, 102 A.2d 804, 806.

The act provides that every instalment sale agreement, as that term is defined in sec. 152(b), shall contain certain provisions (sec. 129) and shall not contain other provisions (sec. 130), and that a copy of such agreement shall be delivered by the seller to the buyer (sec. 128). If the provisions of the act are not complied with, the agreement of sale and the instruments signed by the buyer are

void (sec. 128(b)) and the buyer may cancel the agreement and receive a refund of all payments and deposits made (sec. 128(c) (1)).

The act recognizes the close relationship between dealers and "sales finance companies", and many of its provisions are made applicable to such finance companies as well as to sellers. Art. 83, secs. 130–133, 146, 157, specifically refer to finance companies as defined in sec. 152(h); others apply to all holders. See sec. 152(i). Sec. 147 provides:

> "*Separate notes.* If, as part of an installment transaction, a note is taken by the seller or finance company, such note shall refer to the installment agreement out of which it arises and, in the hands of any subsequent holder, such note shall be subject to all defenses which the buyer might have asserted against the seller or finance company, except that an acknowledgment of delivery of a copy of the agreement by the buyer pursuant to § 128 shall be conclusive proof of such delivery in favor of any assignee of such note without actual knowledge to the contrary."

Sec. 152 contains the following definition, among others:

> "(b) 'Installment sale agreement' means any contract for the retail sale of goods, negotiated or entered into in this State, under which (1) part or all of the price is payable in one or more payments subsequent to the making of such contract, and (2) the seller has retained a security interest in the goods sold or has taken collateral security for the buyer's obligation; * * * *".

### The Issue Defined

All of the parties agree that the sale in the case at bar was a retail sale of goods, negotiated and entered into in this State. The price was payable in instalments after the making of the contract. The Blands concede that no security interest in the goods was retained by the seller. The issue to be decided, therefore, is whether the seller "has taken collateral security for the buyer's obligation", as the term collateral security is defined in sec. 152(p):

> "(p) 'Collateral security' means any security, other than a security interest in goods which are the subject of an installment sale agreement, which is given to secure performance of any obligation of the buyer or any surety or guarantor for him under an installment sale agreement, renewal or extension thereof, or refund agreement, and shall include the undertakings of any surety or guarantor for the buyer and any interest in, encumbrance on, or pledge of, property or goods other than goods the subject of the installment sale agreement."

This issue has been divided into two subsidiary questions, based upon the principal contentions advanced by defendants.

I. The Blands' first contention is that the promissory note on which this action is brought, given by them to Tri-Tilt, with its provision for confession of judgment, itself amounts to such collateral security.

II. Their second contention is that under all of the facts and circumstances in this case—the dealings between the Blands and Tri-Tilt, the relationship between Tri-Tilt and the Loan Association, and the dealings between the Loan Association and the Federal Housing Administration—the undertakings of the United States under the insurance features of Title I of the National Housing Act, together with the obligation assumed by the Loan Association to Tri-Tilt, amount to such collateral security.

### I.

The United States and the third party defendants, Tri-Tilt and the Loan Association, word the first question as follows: "In the sale of chattels in the State of Maryland (i. e., storm windows, storms doors, heating units, and similar items) where there is no retention of title clause in the contract but where

the contract recites a cash price and provides for payments in instalments of certain sums of money per month, and where a confessed judgment promissory note for the gross amount, including finance charges and interest, is executed, does such note constitute 'collateral security' within the purview of Article 83, section 152, sub-paragraphs (b) and (p) ?"

The word collateral and the term collateral security have been given various definitions, depending upon the problem under consideration. But all of the definitions, including that in the act itself, Md.Code, Art. 83, sec. 152(p), require some security in addition to the personal obligation of the debtor. Jones on Collateral Securities, 3d Ed., sec. 1, states: "The term 'collateral security' necessarily implies the transfer to the creditor of an interest in, or lien on, property, or an obligation which furnishes a security in addition to the responsibility of the debtor; therefore, the execution and delivery by the debtor of additional unsecured evidences of his own indebtedness does not in any legal sense constitute collateral security". In re Waddell-Entz Co., 67 Conn. 324, 35 A. 257, 258, the court said: "A debtor's additional promises to pay cannot, from the very nature of the case, be treated as collateral security for his debt, unless such additional promises are themselves secured by a lien on property, or by obligations of third persons." This passage was quoted with approval in Jones v. Third National Bank, 8 Cir., 13 F.2d 86, 87. See also Union National Bank of Johnstown, Pa. v. People's Savings & Trust Co., 3 Cir., 28 F.2d 326, 327.

■ The provision for confession of judgment contained in the note does not constitute collateral security, as that term is used in the Maryland act, especially in view of the fact that sec. 130(b) specifically forbids such a provision in any instrument taken by the seller from the buyer in connection with a retail instalment sale agreement, and sec. 149(b) provides that if such a provision is included the provision shall be absolutely void. See Griffin v. Baltimore Federal Savings & Loan Ass'n, 204 Md. 154, 102 A.2d 804.

## II.

The problems raised by defendant's second contention are more difficult. The Blands contend that under all of the facts and circumstances in this case— the dealings between the Blands and Tri-Tilt, the relationship between Tri-Tilt and the Loan Association, and the dealings between the Loan Association and the F.H.A.—the seller has taken collateral security for the buyers' obligation, within the definition of collateral security in sec. 152(p), which specifically includes the undertakings of any surety or guarantor for the buyer.

### National Housing Act—Title I and Regulations

The National Housing Act, 12 U.S.C.A. § 1701 et seq., provides a program by which financial institutions, the building and allied industries, and the Federal Government combine to assist borrowers to make eligible improvements to their property. Pursuant to that act, the Commissioner has issued regulations which are codified in 24 C.F.R. 200.1 to 201.16. Under those regulations the financial institution, which is referred to as the insured, holds a contract of insurance and "will be reimbursed for its losses on loans made in accordance with the regulations". Sec. 201.11(e).

Reports of a loan are to be made within 31 days from the date of the note or the date on which it is purchased by the lending institution. Sec. 201.10. At the time the Bland note was reported for insurance such transactions were insured 100%; for loans made on and subsequent to October 1, 1954, the amount of the claim is limited to 90%. If, when a claim for loss is filed, it appears that the note is not valid and enforceable against the borrowers, and therefore not insurable under sec. 201.2(a), the government's liability is limited to a return of the premium. Sec. 201.13(d) (3). If the claim is improperly paid by the government, it may recover the amount

from the lending institution under the terms of the assignment. Sec. 201.11 (g).

The Commissioner must approve each lending institution. Sec. 200.2 et seq. The contract of insurance with a lending institution may be terminated with respect to any future business at any time upon five days' written notice from the Commissioner if it appears to the Commissioner that the financial institution is not exercising proper credit judgment, is not taking the steps which may be considered reasonably necessary to safeguard its outstanding loans, or is not exercising proper care in selecting those from whom it purchases notes. See the statement of general administrative policy applicable to property improvement loans reported for insurance under Title I of the National Housing Act, entitled "Property Improvement Loans", p. 2, issued by the F.H.A. for the guidance of lending institutions.

To be eligible for insurance the transactions must meet certain specified requirements. Secs. 201.2 to 201.8. Loans eligible for insurance may be made by the insured institutions to the borrowers directly or to the borrowers through dealers participating in the program. In either case the lending institution is required to investigate and approve the borrower's credit, and to perform all the usual services incidental to the financing of instalment loans. Secs. 201.5, 200.-25(q).

The F.H.A. does not approve dealers for participation in the Title I program. This is the responsibility of the lending institution. The regulations require the insured institution to have a file on each dealer, containing an application signed and dated by the dealer. It is further required that the file contain a signed and dated approval of the dealer, supported by information in the file that the dealer is (1) reliable, (2) financially responsible, (3) qualified to perform satisfactorily the work to be financed, and (4) equipped to extend proper service to the customer. Sec. 201.8.

## Facts

A representative of the Loan Association testified that Tri-Tilt was an approved dealer, but the Loan Association has lost any records it ever had of such approval. Merrill Sachs testified that he was the proprietor of Tri-Tilt on November 6, 1953, but the Loan Association offered in evidence two communications indicating that Annette L. Sachs was the proprietor. Tri-Tilt did not measure, manufacture or install the goods which it sold, but after obtaining an order from a buyer submitted that order to another concern, in this case Little Beaver Manufacturing Company, which measured, manufactured and installed the windows and doors.

William E. Bland has an eighth grade, his wife a sixth grade, education. They purchased their home on West Lexington Street in Baltimore City in 1951 for $6,500, giving a purchase money mortgage to the Loan Association for that amount. A balance of $5,600 was due on the mortgage in November, 1953.

On or about November 6, 1953, a Tri-Tilt salesman persuaded the Blands to buy nine aluminum storm windows, one door, two grills and one transom for $580. He secured the signatures of the Blands to a contract and to an F.H.A. Title I credit application. A representative of Tri-Tilt then telephoned the Loan Association and gave an outline of the deal and of the facts stated in the credit application to a girl, who entered the information on a work sheet. The actual application was not delivered to the Loan Association until it purchased the note and delivered the cash to Tri-Tilt a month or so later, but the Loan Association promptly obtained a credit report. This was the customary procedure. The total instalment obligations of the Blands before the Tri-Tilt deal were over $100, and with the monthly obligations called for by the Tri-Tilt transaction exceeded $130 per month, against monthly earn-

ings of $300.[1] The Loan Association's department head testified that good practice would limit the monthly payments to one week's wages or 25% to 30% of the monthly wages at the most. Despite the unfavorable credit report, the Loan Association sent Tri-Tilt and the Blands a notice stating: "Credit Has Been Approved: (1) In Amount of: $580, (2) Number of Months: 36. We will purchase the note, properly signed and completed, in the above amount (plus discount) when accompanied by the necessary allied papers." On December 1, 1953, the approved amount was increased to $700, and a new notice was sent. The Loan Association took into account the fact that the payments on the mortgage were being kept up promptly. The Loan Association and other lending institutions were avid for this type of business, which yielded a total of 15% interest and finance charges on instalment obligations having an average due date of 18 months, with the principal and certain expenses guaranteed by the United States government for the nominal premium of one-half of one percent.

The Blands did not hear from Tri-Tilt for several weeks after November 6, and Mrs. Bland called that company to cancel the order. The salesman came out to see her and succeeded in selling her a rear storm door and two transoms, increasing the contract price to $727. A new contract for this amount was signed and was dated November 6, 1953. It showed a Contract Price of $727, no Sales Tax, a Total of $727, no Deposit, and a Balance of $727, with an asterisk after the word "Balance". The only indication of the meaning of the asterisk was buried in the second paragraph of the contract, which reads: "The undersigned property owner agrees to pay for said work the sum of Total. $727.00 (* exclusive of Finance charges) payable as follows: $—— with order and balance upon completion of said work in 36 equal monthly installments of about $23.22. First payment to be made about 60 days after completion. All work to be done in a workmanlike manner and to the complete satisfaction of customer." An examination of the contract convinces me that a buyer of ordinary intelligence would not understand the meaning of the asterisk after the word "Balance". The total of $835.90 does not appear in the contract anywhere, although a multiplication of the monthly instalment by the number of months approximates that amount. The contract fails in many respects to comply with the requirements of secs. 128 and 129 of Art. 83 of the Maryland Code.

Most of the items called for by the contract were installed on December 17, 1953, although the Blands claim that the work was not completed until sometime in January, 1954, and the evidence is uncontradicted that one grill has never been installed. On December 17 Mrs. Bland signed a Little-Beaver invoice stating that the storm windows, screens and glass inserts had been received without any defects and had been installed to her satisfaction. On the same day she signed a F.H.A. Title I completion certificate. On December 18, 1953, the Loan Association issued its check to Tri-Tilt in the amount of $727 in exchange for the promissory note, the credit application, the completion certificate and copies of the sales contract. The note was endorsed without recourse to the order of the Loan Association by "Tri-Tilt

---

1. The credit and application, in the handwriting of the salesman but signed by the Blands, gave William E. Bland's monthly salary as $300. The uncontradicted evidence is that he made $60 a week, less withholding; but since this is a motion for directed verdict, and it appears that Mrs. Bland also worked, it must be assumed that the wages of the Blands amounted to $300 a month. The credit report showed that the Blands owed Family Finance $230 and Ayres Loan $300, the two loans requiring monthly payments totaling over $50, and that Hecht's Reliable Stores had declined credit the year before. The Blands still owed the Loan Association $5,600 on the mortgage, which required a monthly payment of $52.

Storm Window Co. by Marie Ann Genova, Secretary", pursuant to the purported authority given to her by Annette L. Sachs.[2]

The Loan Association forwarded a coupon book to the Blands, informing them that the total amount due was $835.90, the first payment being due on February 18, 1954. Shortly thereafter the Blands wrote a series of letters to the Loan Association and Tri-Tilt stating that the total amount was greater than they had understood it would be, and requesting a breakdown of costs. After making one payment of $23.22 on March 8, 1954, the Blands sought legal advice, and on April 14, 1954, made written demand on the Loan Association and on Tri-Tilt for a refund. After the Loan Association had replied to the earlier letters, the attorney for the Blands wrote a follow-up letter to both the Loan Association and Tri-Tilt advising them to remove the storm windows and doors.

The Loan Association made claim against the government for the balance due; the claim was allowed, and the note was assigned to the government "without warranty, except that the note qualified for insurance". The government concedes that it had knowledge of the controversy at the time it purchased the note.

The evidence shows that Tri-Tilt would not have filled the Blands' order unless it had been assured that the Loan Association would purchase the note endorsed without recourse; and that the Loan Association would not have agreed to purchase the note if it had not known that it could be guaranteed against loss by the United States, as a result of the F.H.A. credit application taken by Tri-Tilt from the Blands. Counsel for the Loan Association concede that it intended to insure the Blands' note from the first.

### Discussion

The government and the third party defendants word the second question as follows: "Where, in addition to the facts set out in I above, a financing institution (a) accepts an application for credit under the terms of the National Housing Act (Federal Housing Administration, Home Improvement Loans), intending to insure the transaction, if it is consummated, and (b) subsequently purchases the confessed judgment note executed by the customer to the dealer, endorsed without recourse to the financing institution, and accompanied by a completion certificate and a copy of the contract or a description of the work in accordance with the regulations of the Federal Housing Administration, and (c) with reasonable promptness thereafter insures the transaction under the terms of the National Housing Act, with the Federal Housing Administration—do the application, the insurance, and the other features of the transaction constitute 'collateral security' within the purview of Article 83, section 152"?

Counsel for the Blands properly object that this statement of the question omits any reference to the close relationship between the Loan Association and Tri-Tilt and to the dealings between Tri-Tilt and the Blands. The question should be restated as follows:

Under the facts of this case, does (a) the guarantee of the Blands' note, made by the government to the Loan Association as a result of the F.H.A. credit application taken by Tri-Tilt from the Blands, or (b) the agreement by the Loan Association to purchase that note from Tri-Tilt, endorsed without recourse, made in reliance on its ability to obtain that guarantee, or (c) the guarantee and the agreement taken together, amount to collateral security taken by the seller within the meaning of sec. 152(b) and (p) of the Maryland statute?

Counsel for the government, for the third party defendants, and for the Maryland Bankers' Association seek to have the dealings between Tri-Tilt and the Blands, between the Loan Associa-

---

2. This endorsement raises the question whether the government is a holder of the note at all, let alone a holder in due course.

tion and Tri-Tilt, and between the Loan Association and the F.H.A., treated as separate transactions. But neither the Maryland Retail Installment Sales Act, nor the F.H.A., nor the Loan Association itself, treated them so.

As we have seen, the Maryland statute recognizes the close relationship between sales finance companies and instalment sellers and contains many provisions binding on such finance companies.[3] Secs. 130–133, 146, 157.

The statement of general administrative policy entitled "Property Improvement Loans", issued by the F.H.A. for the guidance of lending institutions, under the heading "Dealer Relationship", states: "Dealer-originated business represents the major portion of Title I improvement loans reported for insurance. The role of the dealer is one of prime importance as he or his salesmen, in effect, represent the lending institution in negotiations with the property owners. Therefore, the lender must select carefully the dealers from whom it purchases Title I notes and a direct and constant control should be maintained over the business transacted."

The Loan Association worked closely with the dealers, in an effort to get as much business as possible from them. The present transaction, which is admitted to be typical, shows that little or no control was maintained by the Associa-

tion over the business transacted, to see that it came within the F.H.A. policy.[4] The Loan Association supplied the dealer with credit application forms, on which the name of the Loan Association was printed in as addressee, and with a book of promissory notes. The Tri-Tilt salesmen had the Blands sign one of these applications at the time he took their order, and the information contained thereon was promptly telephoned to the Loan Association. The credit application, signed by the Blands, was necessary to qualify the transaction for F.H.A. insurance, i. e. to procure for the Loan Association the government's guarantee of the buyer's obligation. The application states on its face: "This application is submitted to obtain credit under the terms of Title I of the National Housing Act".

The close relationship between the Loan Association and Tri-Tilt is shown by the following quotation from the brief filed in this case by counsel for the Loan Association: "In the instant case, no collateral security was taken at the time of making this type loan. Had the lending institution required collateral security, the borrower (Bland) would have undoubtedly executed any other paper which would have been presented to them; but the lending institution, cognizant of the Retail Installment Sales Act of the State of Maryland which sets out

3. This relationship was reemphasized in a report to the General Assembly by the Deputy Administrator of Loan Laws, entitled "Abuses under the Retail Installment Sales Act", as requested by Resolution No. 32 dated February 21, 1951, which included the following statement: "2. *Solicitors, Procurers, and Installment Sellers who Misrepresent the Sale of their Merchandise and are working in Cooperation with Various Lending Agencies.* The above-mentioned people are a menace to the merchandising field because the great majority of them actually do not have an investment in a business, but are operating on a shoestring or who are, perhaps, peddlers selling from door to door. However, in most cases, these people are able to make a better living than the average small, conscientious merchant who has an invest-

ment in his business and a reputation to uphold."

4. The F.H.A. statement quoted above continued: "There are some dealers, or salesmen employed by them, who through a variation of circumstances conduct their business by fraudulent or irregular methods. These irregularities may include such abuses as * * * inflating the sale price, and not disclosing to the borrower that in addition to the cost of the improvements, his note will be for an amount that includes the allowable financing charges. There is no place in the Title I program for such dealers or their employees. The closer the supervision and control maintained by the lender over the dealer the less likelihood there is of misrepresentation, misapplication of funds, overselling or other abuses. * * * *"

that collateral security would bring the transaction within the purview of the Retail Installment Sales Act, has deemed it prudent to abstain from taking any collateral security."

As we have seen, the term collateral security has been given various definitions, depending upon the problem under consideration. It always implies some security in addition to the personal obligation of the debtor, but that security may be the obligation of a third person.[5]

The definition in the Maryland statute is very broad. Sec. 152(p) provides that the term collateral security shall include "any security, other than a security interest in goods which are the subject of an installment sale agreement, which is given to secure performance of any obligation of the buyer or any surety or guarantor for him under an installment sale agreement, renewal or extension thereof, or refund agreement, and shall include the undertakings of any surety or guarantor for the buyer * * *."

The obligations assumed by the United States under Title I of the National Housing Act and the Regulations adopted pursuant thereto amount to a guarantee of the buyers' note. The fact that it is called insurance rather than a guarantee does not change the essential character of the obligation. Nor does the fact that the premium of one-half of one percent was paid by the Loan Association alter the essential nature of the transaction. It is immaterial whether the premium on a surety bond is paid by the obligor or the obligee; a surety bond is still a surety bond, and a guarantee is still a guarantee. Counsel for the Maryland Bankers' Association concede in their brief: "In a sense certainly the contract of insurance between the Federal Housing Administration and the bank is a suretyship—a secondary undertaking by the Administration that the vendee's debt shall be paid and that, if it is not, the Administration will save the bank harmless". They contend, however, "that this is not the sort of transaction that the Legislature intended to include within the meaning of 'surety or guarantor' in Paragraph (p)", and argue: "The Act is designed to protect the buyer at the moment that he enters into the contract; it seeks to forestall him and those with him from falling victim either to his own ignorance or improvidence or to the impositions of the unscrupulous or the over eager. We believe, then, that 'surety * * * for the buyer' means a surety offered by the buyer at the time of contracting who will undertake then to see that the debt is paid if the buyer defaults."

The buyers, the Blands, did offer such a surety or guarantor, by signing the F.H.A. Title I credit application at the time they signed the order for the goods. True, they were not required to seek out some friend or relative who would guarantee their note; the government has agreed to serve as a universal uncle for that purpose. But the government serves only when it is requested to do so by the borrowers or buyers. The signing of the F.H.A. Title I credit application was such a request.

The undertaking of the government was collateral to the obligation of the Blands, and was security for that obligation.

This additional collateral security was "taken" by the seller, within the meaning of sec. 152(b). The fact that the guarantee ran to the Loan Association and not to the seller is immaterial if the transaction is viewed as a whole, and proper consideration is given to the close relationship between the Loan Association and the dealer, which is recognized both by the Maryland statute and by the Federal act and regulations, and

---

5. Jones on Collateral Securities, 3d ed., sec. 1; In re Waddell-Entz Co., 67 Conn. 324, 35 A. 257; Jones v. Third National Bank, 8 Cir., 13 F.2d 86, 87; Union National Bank of Johnstown, Pa. v. People's Savings & Trust Co., 3 Cir., 28 F.2d 326, 327.

to the obligation assumed by the Loan Association to purchase the note from the dealer.

One final point must be considered. The government argues that since only valid obligations can properly be insured under Title I of the National Housing Act, if the guarantee amounts to collateral security and renders the note invalid, the note would not be insurable, and the insurance "could not be considered security in any sense of the word". This seeming paradox loses its force when it is remembered that the insurance or guaranty does not render such a note invalid, although it may bring the sale within the scope of the Maryland Retail Installment Sales Act. It is the failure of the seller to comply with the terms of that act which gives the buyers the right to cancel the sales agreement, and to terminate their liability on the note. Sec. 128.

■ The government, as well as the Loan Association, is subject to all defenses which could have been raised against the seller, even though the Loan Association would otherwise have been a holder in due course. Sec. 147. And under the facts of this case the Loan Association was not a holder in due course of the note. See Griffin v. Baltimore Federal Savings & Loan Ass'n, 204 Md. 154, 160, 102 A.2d 804; Cf. United States v. Hansett, 2 Cir., 120 F.2d 121, 122. The government, as its assignee, has no greater rights against the Blands than the Loan Association had. The government need not have paid the claim of the Loan Association. The assignment of the note to the government was made "without warranty, except that the note qualified for insurance", so the government may still have a right of action against the Loan Association. But it has no right to recover from the Blands.

This conclusion is not at variance with the purpose of the National Housing Act. That purpose can best be accomplished if sellers and lending institutions comply not only with the provisions of the national act and the regulations adopted pursuant thereto, but also with the applicable provisions of state statutes which have been passed to protect small home owners.

The clerk is instructed to enter a judgment for defendants, without costs.